**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **NATALIE MCLENAGHAN**<br>206 S. Nash St, Apt 259<br>Hillsborough, NC 27278<br><br>*Plaintiff*<br><br>v.<br><br>**HOWARD LUTNICK, in his official capacity as Secretary, United States Department of Commerce**<br>1401 Constitution Ave NW<br>Washington, DC 20230<br><br>*Defendant* | **Case No.** ________________________ |

**COMPLAINT AND JURY DEMAND**

COMES NOW, PLAINTIFF, Natalie McLenaghan (hereinafter, "Plaintiff" or "Ms. McLenaghan") by and through undersigned counsel, and sues Defendant, Howard Lutnick, in his official capacity as Secretary of the United States Department of Commerce (hereinafter, "Defendant," "DOC," the "Agency", or "Defendant Agency"), and as cause states::

**PARTIES**

1. Plaintiff Natalie McLenaghan resides at 206 S. Nash St, Apt 259, Hillsborough, NC 27278. Ms. McLenaghan previously worked for the National Oceanic and Atmospheric Administration ("NOAA") of the United States Department of Commerce ("DOC") at all relevant times, primarily at NOAA Headquarters, 1315 East-West Highway, Silver Spring, Montgomery County, Maryland 20910. Plaintiff is a gay woman with a disability.

2. Defendant Howard Lutnick is sued here solely in his official capacity as Secretary of the United States Department of Commerce. The United States Department of Commerce, at all

relevant times, maintained an address of 1401 Constitution Ave NW, Washington, DC 20230. Defendant employed Plaintiff within the meaning of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Rehabilitation Act (the "Rehabilitation Act"), 29 U.S.C. § 701, *et seq.*, at the aforementioned location.

## JURISDICTION AND VENUE

3. Plaintiff's Jurisdiction in this case is based upon 28 U.S.C. §§1331.

4. This Court has jurisdiction over the subject matter of this action under Title VII, 42 U.S.C. § 2000e, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et seq*.

5. Venue in this case is based upon 28 U.S.C. § 1391, as most or all of the incidents which give rise to this case occurred in Maryland in this District and Division, and the Defendant maintains sufficient contacts in the State of Maryland.

6. Plaintiff has timely complied with any conditions precedent and jurisdictional prerequisites to filing suit.

7. Plaintiff brings this civil action pursuant to Title VII and the Rehabilitation Act, both of which provide for de novo review of federal-sector discrimination claims in this Court following the conclusion of the administrative process.

8. Plaintiff timely exhausted any and all administrative remedies, including contacting an EEO Counselor, filing formal EEO Complaints, requesting and receiving Final Agency Decisions ("FAD"), and appealing to the EEOC Office of Federal Operations ("OFO"), before filing the instant lawsuit in this Court. The instant lawsuit regards two EEO complaints, as follows:

a. Complaint One (EEOC Appeal No. 2025000146): Ms. McLenaghan contacted an EEO Counselor on January 31, 2023, and, following the conclusion of the EEO counseling process, filed a formal complaint on May 16, 2023, asserting discrimination on the

basis of sex (female/sexual orientation [gay]), disability (mental), and retaliation for protected EEO activity. Following her November 29, 2023 receipt of the Report of Investigation ("ROI"), Ms. McLenaghan initially pursued her claims via the Equal Employment Opportunity Commission (hereinafter "EEOC") Hearing process. Prior to discovery though, Ms. McLenaghan withdrew her Complaint from the EEOC Hearing process and requested a FAD. After the Agency issued a FAD in its own favor on September 9, 2024, Ms. McLenaghan timely appealed to the EEOC Office of Federal Operations ("OFO") on October 9, 2024. As of the date of filing the instant Complaint, the OFO has not yet issued a decision on this appeal. This Complaint is ripe to file with this Court as more than one hundred eighty (180) days have elapsed since Ms. McLenaghan filed this appeal with the OFO on October 9, 2024.

b. Complaint Two (EEOC Appeal No. 2025002612): Ms. McLenaghan contacted an EEO Counselor on April 29, 2024, and, following the conclusion of the EEO counseling process, filed a formal complaint on June 12, 2024, asserting discrimination on the basis of disability (mental) and retaliation for protected activity (EEO activity and requesting and using disability accommodations). Following her February 12, 2025 receipt of the Report of Investigation ("ROI"), Ms. McLenaghan requested a FAD. After the Agency issued a FAD in its own favor on March 31, 2025, Ms. McLenaghan appealed to the EEOC Office of Federal Operations ("OFO") on April 30, 2025. The OFO issued a Decision on this appeal on June 10, 2026, mailed it thereafter on or about June 10, 2026, and Plaintiff received the Decision via counsel on June 10, 2026.

## <u>FACTS COMMON TO ALL CAUSES OF ACTION</u>

9. NOAA subjected Natalie McLenaghan, a NOAA employee, to a long pattern of discrimination, retaliation, and harassment causing a hostile work environment on the basis of her sex (female/sexual orientation [gay]), disability (mental), and protected EEO activity (reporting discrimination and harassment, requesting and relying upon reasonable accommodations), culminating in her constructive discharge.

10. Natalie McLenaghan ("Ms. McLenaghan") began working at NOAA on February 1, 2015. She began as a Science and Policy Fellow from February 1, 2015, through January 31, 2016, in the NOAA Restoration Center, within the Deepwater Horizon Restoration Program. She then worked as a Marine Habitat Resource Specialist, ZP-0401-03, with the Community-based Restoration Program ("CRP"), Restoration Center ("RC"), Office of Habitat Conservation ("OHC"), National Marine Fisheries Service ("NMFS"), NOAA—first as a contract employee with Earth Resources Technology ("ERT"), Inc., from February 1, 2016 through January 8, 2017, and then as a federal, full-time employee ("FTE") from January 9, 2017, through November 2, 2024.

11. In Ms. McLenaghan's position as Marine Habitat Resource Specialist, ZP-0401-03, which she held at all time relevant to this Complaint, she served as a federal program officer. Her duties included overseeing grant recipients, advising on the programmatic aspects of federal awards, serving as the headquarters leader and point of contact for Atlantic salmon restoration work, co-coordinating the Northeast region's monthly team calls, and serving as Competition Manager for the office's funding competitions

12. Ms. McLenaghan's first- through fifth-line supervisors were as follows during the relevant period of time:

- Complainant's first-line supervisor: Jessica Edwards ("Ms. Edwards"), Supervisory Marine Habitat Resource Specialist ZP-0401-04, Program Manager for the Community-based Restoration Program (CRP), Restoration Center, OHC, NMFS, NOAA, DOC.

- Complainant's second-line supervisor: Tisa Shostik ("Ms. Shostik"), Supervisory Marine Habitat Resource Specialist ZP-0401-05, Deputy Division Chief of the NOAA Restoration Center, OHC, NMFS, NOAA, DOC.

- Complainant's third-line supervisor: Christopher "Chris" Doley ("Mr. Doley"), Division Chief of the NOAA Restoration Center, OHC, NMFS, NOAA, DOC.

- Complainant's fourth-line supervisor: Sunny Snider ("Ms. Snider"), Deputy Director of Office of Habitat Conservation, NMFS, NOAA, DOC.

- Complainant's fifth-line supervisor: Carrie Robinson ("Ms. Robinson"), Director of the Office of Habitat Conservation, NMFS, NOAA, DOC.

13. NOAA, including Ms. McLenaghan's supervisory chain and all relevant decisionmakers, were aware of Ms. McLenaghan's sex (including sexual orientation), disability, and protected activities of requesting reasonable accommodations and filing complaints of discrimination and retaliation, as they had access to her personnel file; as her sex was visually apparent; as she brought her concerns of discrimination, harassment, and retaliation to the relevant decisionmakers; as she brought her reasonable accommodations requests and related concerns to the relevant decisionmakers; as she had informed the relevant decisionmakers of her sex (including sexual orientation), disability, and protected activities; and as the relevant decisionmakers have previously testified.

14. Ms. McLenaghan enjoyed her work and consistently performed her role at or above NOAA's legitimate and reasonable expectations, as corroborated by evidence including her contemporaneous annual performance appraisals.

15. Ms. McLenaghan has Generalized Anxiety Disorder, a disability that substantially limits major life activities including sleeping, concentrating, working, and managing stress. Her

symptoms include panic attacks, heart palpitations, stress-induced fasciculation, gastrointestinal distress, impaired focus and concentration, and excessive rumination.

16. Defendant was aware of Ms. McLenaghan's disability. She disclosed her diagnosis to Ms. Edwards, and she applied for and received a reasonable accommodation for full-time telework. Ms. McLenaghan submitted her first accommodation request on May 24, 2022. Ms. Edwards approved full-time telework effective June 13, 2022, and approved a one-year renewal on September 7, 2022.

17. Ms. McLenaghan performed the essential functions of her position with her telework accommodation in place, as her strong performance during the accommodation period demonstrates. Her treating therapist, a licensed clinical mental health counselor, "strongly recommend[ed] that Ms. McLenaghan be granted the accommodation of full-time telework on a permanent basis," explaining that "[t]he communal office setting presents multiple triggers that can exacerbate Ms. McLenaghan's symptoms" and that "her condition is chronic in nature."

18. John Catena ("Mr. Catena") is the Northeast Regional Supervisor of the Restoration Center, based in Gloucester, Massachusetts. Ms. McLenaghan was required to work closely with Mr. Catena on Northeast projects, including Atlantic salmon restoration, although he was not her direct supervisor.

19. From the time Ms. McLenaghan joined the team in 2016, Mr. Catena excluded her, leaving her out of important conversations and email chains and ignoring her contributions. His conduct was not random. Mr. Catena treated women and openly gay employees less favorably than others.

20. Mr. Catena deferred to his male subordinates as subject-matter experts, credited them with Ms. McLenaghan's work, and delegated to them tasks that fell within Ms.

McLenaghan's responsibilities as a federal program officer. He repeatedly bypassed Ms. McLenaghan to follow up with grantees himself, which was not part of his job, or to route her work to male subordinates, and then scolded her when she followed protocol and contacted grantees as her own supervisor had instructed.

21. Mr. Catena's animus toward women was overt. As one example, around the time of a female employee's parental leave and a hiring search, Mr. Catena told a male subordinate, Richard "Rich" Takacs ("Mr. Takacs") that he "did not want to hire women because they get pregnant and take maternity leave." Mr. Takacs shared this shocking comment with Ms. McLenaghan and other coworkers at an office retreat in September 2016. Additionally, at least one other female employee has corroborated that Mr. Catena uses condescending and diminishing language toward female employees more than male employees.

22. Mr. Catena also displayed hostility toward gay employees. As one example, he described his practice of circumventing required travel approvals as a "Don't Ask, Don't Tell" policy, invoking charged and insensitive terminology given the history of that policy for LGBTQ members of the military. Ms. McLenaghan was openly gay in the workplace; her biographical profile was featured in NOAA Fisheries' June 2022 "Celebrating Pride Month" website and social media, and she brought a female partner to work-related social events.

23. Mr. Catena's conduct was so pervasive that, beginning in January 2021, an OHC culture program manager convened the Northeast region he managed for a year of workplace-culture consultations, workgroups, and a culture survey to address problems that other regions in the Restoration Center did not experience.

24. Ms. McLenaghan did not suffer in silence. She reported Mr. Catena's conduct repeatedly, through the chain of command and in writing, to no avail.

25. Mr. Catena repeatedly circumvented Ms. McLenaghan's role. As one example, on April 29, 2019, Ms. McLenaghan emailed Mr. Catena directly, asking to be included in communications about the status of projects and funding that she was tasked with overseeing: "It is critical that we be included in these conversations." Mr. Catena never responded. This was just one instance of a pattern of Mr. Catena routinely excluding Ms. McLenaghan from *her own work assignments* and instead reassigning her work to himself and/or his own male subordinates, despite the fact that he was not in her supervisory chain. Ms. McLenaghan contemporaneously discussed Mr. Catena's exclusion with members of her supervisory chain, Ms. Shostik and Ms. Edwards.

26. On February 11, 2020, Ms. McLenaghan emailed Ms. Shostik that she had "reached a breaking point with John Catena," describing how she had "felt chronically undermined, excluded, and disrespected by him since I joined this team four years ago." Ms. Shostik responded the same day: "I'm sorry to hear that things have not improved at all," confirming that management had received prior complaints about Mr. Catena's conduct.

27. On July 20, 2021, Ms. McLenaghan emailed Ms. Shostik about the "problematic communication and abrasive treatment that has pervaded the past 5.5 years," and stated plainly: "I am dealing with a lot of physical and mental health challenges this year (which John has directly contributed to), and the hostile work environment that he creates is something that I can no longer tolerate."

28. On July 22, 2021, Ms. McLenaghan met with Ms. Shostik and Ms. Edwards and expressly reported her perception that Mr. Catena was biased against women and against gay people. Ms. Shostik spoke with Mr. Catena, who claimed he had "no idea" his behavior was a problem, a response Ms. McLenaghan understood to be his standard reaction when confronted.

Upon knowledge and belief, Ms. Shostik took no further action to address Ms. McLenaghan's July 22, 2021 complaints of discrimination and harassment.

29. Accordingly, Mr. Catena's pattern of unduly excluding Ms. McLenaghan from meetings critically relevant to her job responsibilities continued. As one more example, in late 2021, Mr. Catena's subordinate, Matthew "Matt" Collins ("Mr. Collins"), engaged in decision-making discussions with grantees without including Ms. McLenaghan– discussions that were part of Ms. McLenaghan's core job responsibilities and in which she should have been included. When Ms. Edwards instructed that Ms. McLenaghan be included, Mr. Collins objected that including her would "introduce a very different dynamic" and that "we will not have such a free-wheeling discussion." Ms. Edwards responded by reiterating that "[t]his needs to be a more inclusive process."

30. On the morning of June 14, 2022, Ms. McLenaghan participated in a video conference call with Mr. Catena and one of his subordinates. When Ms. McLenaghan informed Mr. Catena that procurement requests had already been submitted, as her supervisors had directed, Mr. Catena became irate. He repeatedly stated how annoyed he was and that it "never should have happened!" He continued in an intimidating fashion. Ms. McLenaghan began shaking and trembling beyond her control and hung up because she was experiencing the onset of a severe panic attack, a symptom of her disability.

31. That same day, June 14, 2022, Ms. McLenaghan reported the incident to office leadership in an email titled "Urgent: Workplace Bullying," explaining that she was "too shaken up, literally and figuratively, to have a verbal discussion about this right now." Also that day, Ms. Edwards emailed Mr. Catena, telling him he could not communicate with Ms. McLenaghan verbally or by email without Ms. Edwards included, and that he needed to "watch his tone."

32. On June 24, 2022, Ms. McLenaghan filed a formal complaint of harassment under Departmental Administrative Order 202-955, based on sex (female and LGBTQ). This was protected activity.

33. Ms. McLenaghan's distress was severe and known to management. She disclosed to Ms. Edwards that Mr. Catena's June 14, 2022 conduct had caused a panic attack. Months later, Ms. McLenaghan verbally disclosed to Ms. Edwards that she felt suicidal in direct response to Mr. Catena's discriminatory and hostile conduct and its exacerbation of her disability. Ms. Edwards did not respond.

34. Rather than protect Ms. McLenaghan, management signaled that Mr. Catena would face no consequences. On July 20, 2022– while NOAA's active investigation into Ms. McLenaghan's June 24, 2022 harassment complaint was ongoing– Ms. Edwards told Ms. McLenaghan: "Presumably, John [Mr. Catena] is going to keep his job, and hopefully you will still want to stay in yours, and the two of you need to figure out how to work together."

35. On September 12, 2022, the Agency closed the inquiry, concluding there was "not sufficient evidence to determine that you were subjected to workplace harassment based on your sex (female and/or LGBTQ)," and taking no corrective or disciplinary action against Mr. Catena. The Agency's inquiry was inadequate and incorrect. The Agency did not allow Ms. McLenaghan any opportunity to submit any rebuttal statement(s), nor did NOAA allow Ms. McLenaghan to appeal its determination.

36. NOAA soon compounded its harm to Ms. McLenaghan by appointing Mr. Catena to serve as a panelist on the very panel review that Ms. McLenaghan was managing as Competition Manager in the fall of 2022, while her harassment complaint against him was still pending. During that November 2022 panel review, Mr. Catena blamed Ms. McLenaghan for supposed

inconsistencies in her assignments in front of all of the panel members. Learning that the office had assigned Mr. Catena to her panel caused Ms. McLenaghan to suffer another severe panic attack and exacerbated the symptoms of her disability throughout her preparation in the week leading up to the panel meeting.

37. Despite Ms. McLenaghan's strong performance record, Defendant inserted unjustified criticism into her FY 2021 and FY 2022 performance appraisals as "suggestions for improvement" directed at her interactions with her harasser after she had reported his discriminatory treatment.

38. Both appraisals included a "suggestion for improvement" that Ms. McLenaghan work on "finding common ground with people with different working styles." When Ms. McLenaghan, surprised by this feedback but eager to continue her strong performance, asked for further detail on this suggestion for improvement, Ms. Edwards admitted that this suggestion did not apply to Ms. McLenaghan's interactions with any colleagues other than Mr. Catena. In other words, Defendant faulted Ms. McLenaghan, in her formal performance record, for the very working relationship in which she was the victim of harassment.

39. At the November 3, 2022 feedback session for the FY 2022 appraisal, Ms. Edwards spent less than five minutes on Ms. McLenaghan's many achievements and roughly forty minutes on the disputed criticism. Ms. Edwards appeared visibly uncomfortable and acknowledged that the comments related to Ms. McLenaghan's interactions with Mr. Catena.

40. On November 4, 2022, in a meeting following up on the previous day's feedback session, Ms. McLenaghan told Ms. Edwards that including the criticism made her want to leave her position. Ms. Edwards dismissed her concern, telling her it was "not a big deal" and was "just feedback," while conceding that Mr. Catena can be "condescending, disrespectful, and difficult to

work with." Ms. McLenaghan requested that the criticism be removed, but Ms. Edwards refused. Ms. Edwards ensured the unjustifiable criticism remained in Ms. McLenaghan's FY 22 appraisal.

41. By contrast, even though management acknowledged that they had concerns about Mr. Catena's difficult conduct, and that others had complained about Mr. Catena's difficult conduct, management implemented no corrective action.

42. Throughout the relevant period of time, Defendant failed to take any meaningful action to stop the harassment. When Ms. McLenaghan asked what actions had been taken against Mr. Catena, she was told management was "not allowed to discuss that." No corrective or disciplinary action was taken. Mr. Catena continued to serve on hiring panels and, as noted, was placed on the very panels Ms. McLenaghan was managing (including, but not limited to, panels in 2022 and 2024).

43. When Ms. McLenaghan repeatedly asked to meet with leadership in 2022 to discuss Mr. Catena's harassment, she received no response. Management failed even to follow up with Ms. McLenaghan, much less to meet with her, about her serious harassment concerns, later claiming that was because management "weren't sure exactly who you wanted to meet with."

44. On November 29, 2022, one of Mr. Catena's male subordinates disclosed to Ms. McLenaghan that, during his own performance feedback session, Mr. Catena openly told him that he had asked Ms. Shostik to remove Ms. McLenaghan from her Northeast portfolio "because [she] had filed harassment complaints against him." Mr. Catena told management that working directly with Ms. McLenaghan would be "untenable."

45. NOAA management initially denied Mr. Catena's request to remove Ms. McLenaghan from her Northeast portfolio.

46. On December 19, 2022, Ms. McLenaghan escalated her discrimination complaint, sending an email to Ms. Snider and Ms. Robinson detailing her long history of concerns, requested mediation, and raised Mr. Catena's use of sexist and homophobic terminology. This was protected activity.

47. Mere weeks later, and only following Ms. McLenaghan's December 19, 2022 complaint, NOAA management did what Mr. Catena had asked. On January 11, 2023, in a meeting with Ms. Edwards, Ms. Shostik, and Ms. Snider, Ms. McLenaghan was told she would no longer work on the Northeast portfolio. The decision was, in management's words, final, effective immediately, and not up for discussion. Management made this decision despite Ms. McLenaghan expressly previously requesting not to be removed from the Northeast portfolio, as it was a central part of her job responsibilities and as the Agency benefitted from Ms. McLenaghan's long working relationships within the Northeast portfolio.

48. The removal was severe. It changed more than half of Ms. McLenaghan's existing portfolio and severed seven years of working relationships she had built with grantees and staff in the Northeast. Defendant instructed Ms. McLenaghan to remove her role as the Atlantic Salmon Headquarters Leader and her role as Northeast Regional Co-coordinator from her performance plan, roles she had held since FY 2017 and FY 2021 respectively.

49. Ms. Edwards told Ms. McLenaghan that she disagreed with upper management's decision to remove some of Ms. McMenaghan's core job responsibilities and alter her work portfolio as well as how upper management delivered its decision to Ms. McLenaghan. Ms. Edwards further disclosed, on February 2, 2023, that someone outside the office had advised Ms. Snider that it would be a "legal liability" for the office to have Mr. Catena and Ms. McLenaghan continue to work together "because of the prior harassment investigation," creating "an urgent

need to separate us." When Ms. McLenaghan later asked Ms. Robinson directly about that advice, Ms. Robinson called it "absolutely false information," contradicting Ms. Edwards' contemporaneous account.

50. Defendant's stated reasons for altering and removing Ms. McLenaghan's job duties were pretextual and shifting. Management claimed the change was necessary to address an "influx" of West Coast infrastructure work, but of the 108 new awards from the relevant funding opportunities, 54 were on the West Coast and 54 were on the East Coast. Management also claimed the change was "for [Ms. McLenaghan's] own good," to reduce her stress, recasting retaliation as benevolence. Further demonstrating that the Agency's motives were pretextual, On January 31, 2023, Ms. Snider emailed Ms. McLenaghan a defense of Mr. Catena, encouraging her to "think about the challenges we face when collaborating with others" and describing what Mr. Catena was "allowed" to do as a supervisor, rather than addressing the misconduct Ms. McLenaghan had reported.

51. The timing and the admissions make Defendant's motive plain. Mr. Catena asked that Ms. McLenaghan be removed because she had complained about him; management removed her weeks after she escalated her complaint to Ms. Snider and Ms. Robinson; and management admitted the removal was driven by the prior harassment investigation and Ms. McLenaghan's complaints about Mr. Catena's discriminatory treatment– in other words, Ms. McLenaghan's protected activity.

52. After her removal from the portfolio and amidst the Agency's continuing pattern of discrimination and harassment, Ms. McLenaghan's disability rendered her unable to go into the office building in Silver Spring due to her disability. Accordingly, through late January and early February 2023, she asked to change her duty station. On February 15, 2023, Ms. Edwards relayed

that Ms. Shostik had denied the request because Ms. McLenaghan's "position needs to be based in Silver Spring, Maryland."

53. On February 16, 2023, Ms. McLenaghan emailed Ms. Edwards and Ms. Shostik a formal "Request for Approval of Remote Work." She never received any response, written or verbal.

54. The Agency treated comparators outside Ms. McLenaghan's protected classes, and without her protected activity, far more favorably. Defendant approved duty station changes for other OHC employees and permitted numerous other OHC employees to relocate or work remotely, including employees who moved to Florida, Massachusetts, Arizona, Washington, and other locations.

55. By contrast, when Ms. McLenaghan sought a duty station change, Ms. Robinson denied her request, responding that if she allowed Ms. McLenaghan to change duty stations, she would "have to grant that request to everybody," a rationale the Agency did not apply to Ms. McLenaghan's comparators it had already accommodated.

56. As Ms. McLenaghan continued to engage in protected activity, Defendant's hostility extended to her disability accommodation.

57. When Ms. McLenaghan sought to renew her telework accommodation in 2023, NOAA shifted the deciding official from her first-line supervisor, Ms. Edwards, to her second-line supervisor, Ms. Shostik, without any explanation. On August 25, 2023, the Agency's Reasonable Accommodation Coordinator told Ms. McLenaghan that her managers were "resisting" granting long-term telework because they felt they had "accommodated [her] enough already."

58. Consistent with that resistance, on September 1, 2023, Ms. Shostik extended Ms. McLenaghan's accommodation for only 60 days rather than the year Ms. McLenaghan had

requested, requiring additional documentation. Ms. McLenaghan submitted supplemental medical documentation, and on October 19, 2023, Ms. Shostik approved full-time telework subject to a caveat that Ms. McLenaghan report to the office when "the operational needs and work requirements of the organizational unit require [her] on-site presence."

59. Defendant treated a comparator more favorably. A Restoration Center employee with the same job title, the same duty station, and the same chain of command, who had not engaged in protected EEO activity, requested permanent full-time telework and received a decision memorandum, issued within weeks of Ms. McLenaghan's, that imposed no time limitation on the duration of her agreement.

60. On September 7, 2023, six days after Ms. Shostik limited Ms. McLenaghan's accommodation to 60 days, Ms. Edwards directed Ms. McLenaghan to clean out the cubicle she had occupied since 2015, within one week.

61. Defendant also mishandled Ms. McLenaghan's confidential medical information. Ms. McLenaghan reported to the Agency's Bureau Chief Privacy Officer and NOAA Privacy Act Officer her concern that her reasonable accommodation decision memorandum disclosed information about her health provider and condition beyond what was appropriate, and that calendar entries concerning her accommodation requests were accessible to other Agency employees. Defendant did not provide Ms. McLenaghan any report of its inquiry before she left the Agency, and her messages to the Office of General Counsel went unanswered.

62. Exhausted from the Agency's continued discrimination and retaliation against her but still passionate about the Agency's work, around 2023, Ms. McLenaghan looked into the possibility of moving to a different position in the Agency under a different supervisory chain. She spoke with Leslie Craig ("Ms. Craig"), Southeast Regional Supervisor (reporting to Ms. Shostik)

around January 2023, and Ms. Craig said that she would love for Ms. McLenaghan to join her team. Excited, Ms. McLenaghan awaited either further word from Ms. Craig and/or a USAJobs posting of a position on Ms. Craig's team. Thus, when such a position was posted on USAJobs on approximately June 5, 2023, Ms. McLenaghan promptly submitted her application on approximately June 8, 2023. Management interviewed Ms. McLenaghan on approximately July 21, 2023, and August 11, 2023, but notified her on August 26, 2023 that they were not selecting her for the position. Management provided no legitimate reason for this nonselection despite its direct contradiction to Ms. Craig's excitement at the prospect of Ms. McLenaghan joining her team and Ms. McLenaghan's years of experience in a very similar position.

63. The Agency's discrimination against Ms. McLenaghan continued throughout 2023 into 2024. On April 2, 2024, Ms. McLenaghan requested two hours of annual leave on each of April 9 and April 10, 2024, a total of four hours, to provide buffer time for personal travel.

64. On April 4, 2024, roughly thirty minutes after denying a separate accommodation request concerning Ms. McLenaghan's speaking role at an upcoming grants panel that included Mr. Catena, Ms. Edwards denied the leave requests, asserting that Ms. McLenaghan's presence as Competition Manager was needed for panel preparation. The purportedly "mission-critical" preparatory meetings were not added to Ms. McLenaghan's calendar until after her leave requests had already been denied.

65. Ms. Edwards did not act alone. Before denying the leave, she consulted with her supervisors and Employee and Labor Relations ("ELR"), an atypical escalation of a routine four-hour leave request, and she relied on ELR to craft her written responses to Ms. McLenaghan.

66. The disparate treatment was stark. Ms. Edwards admitted that she had never denied a leave request for any of her other direct reports. Another employee who served as a Competition

Manager took a three-week leave during the same relevant period, and Ms. Shostik granted Ms. Edwards herself last-minute approval to be excused for an entire workday due to personal travel delays.

67. Defendant used in-person meeting requirements to target Ms. McLenaghan because of her disability accommodation and her protected activity. In her May 17, 2024 mid-year progress review, Ms. Edwards wrote in the "Suggestions for Improvement" section that "there will be additional in-person meetings, both one on one check-ins and in-person team meetings this year and I expect Ms. McLenaghan to attend in person whenever requested." Ms. Edwards admitted that she did not include comparable language in the reviews of her other direct reports because they were in the office.

68. On July 11, 2024, Ms. Edwards told the team she was scheduling in-person meetings because she was "sick of looking at squares on a screen." A colleague understood that this requirement would not extend to Ms. McLenaghan because she was teleworking; Defendant applied it to her anyway.

69. Ms. Edwards insisted that Ms. McLenaghan's performance review meetings occur in person at a federal facility, retreating from earlier offers of off-site options, and required a change from a virtual to an in-person meeting that caused Ms. McLenaghan an immediate physiological reaction due to her disability.

70. In July 2024, contemporaneously with the collection of management affidavits in a related harassment inquiry, Ms. Edwards raised new and false accusations regarding Ms. McLenaghan's communications on a grant negotiation. When Ms. McLenaghan corrected the record on July 27, 2024, Ms. Edwards did not respond. These manufactured performance concerns were pretext.

71. Defendant's escalating discrimination and retaliation made Ms. McLenaghan's working conditions intolerable. She went from feeling that she belonged and that her contributions were valued to feeling alienated, ostracized, and punished for coming forward.

72. Defendant constructively discharged Ms. McLenaghan effective November 2, 2024. Left with no reasonable alternative, Ms. McLenaghan accepted a position at another federal agency to escape the ongoing harassment and discrimination, ending her nearly ten-year tenure at NOAA on November 2, 2024. In doing so, she gave up a permanent, career-conditional federal position for a non-permanent, term-limited appointment, at a lower salary, harming her career progression, earnings, and benefits.

73. As a direct and proximate result of Defendant's conduct, Ms. McLenaghan has suffered and continues to suffer severe emotional distress, exacerbation of her disability, panic attacks, suicidal ideation, humiliation, and the loss of professional standing and career trajectory. She has incurred, and continues to incur, the cost of increased medical treatment and therapy. Her damages are ongoing.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Discrimination Based on Sex in Violation of Title VII)

74. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

75. Defendant's conduct as described in this Complaint constitutes discrimination on the basis of race in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* and its implementing regulations.

76. At all relevant times, Defendant NOAA was an employer within the meaning of Title VII, 42 U.S.C. § 2000e, *et seq.*

77. At all relevant times, Plaintiff was an employee within the meaning of Title VII, 42 U.S.C. § 2000e, *et seq*.

78. At all relevant times, Plaintiff was qualified to perform the essential functions of her job.

79. Plaintiff is a member of a protected class (sex, including sexual orientation) as she is a gay woman.

80. Defendant was aware of Plaintiff's sex (including her sexual ori.

81. Defendant's adverse treatment of Plaintiff was due to her sex.

82. Defendant's disparate treatment of Plaintiff was due to her sex.

83. Defendant's unlawful discrimination against Plaintiff via adverse actions including, but not limited to, its undue changes to her job duties, alterations to her work portfolio, constructive discharge, harassment, bullying, and isolation of Plaintiff was due to her sex.

84. Defendant constructively discharged Plaintiff due to her sex.

85. Plaintiff's sex was the cause of Defendant's adverse treatment of her, in violation of Title 20 and its implementing regulations, as indicated by Defendant's different, preferential treatment of similarly situated employees of different sexes as described above.

86. Plaintiff's sex was at least a motivating factor in Defendant's adverse treatment of Plaintiff, but was also a but-for cause of Defendant's adverse treatment of Plaintiff. Defendant's actions therefore constitute unlawful sex discrimination in violation of Title VII.

87. Defendant's adverse treatment of Plaintiff gives rise to an inference of discrimination.

88. The acts committed by Defendant as alleged above willfully disregarded for Plaintiff's rights.

89. As a direct and proximate result of these unlawful acts by Defendant, Plaintiff has suffered and continues to suffer economic and noneconomic damages including but not limited to economic losses, lost benefits and entitlements, damage to her career and reputation, damage to her health, pain, suffering, humiliation, and emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendant for economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, compensatory damages and damages for her mental anguish and humiliation and professional harm, and such other and further relief this Honorable Court determines just and equitable, including all available legal, statutory, and equitable relief.

**COUNT TWO**
**(Harassment and Hostile Work Environment Based on Sex in Violation of Title VII)**

90. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

91. Defendant's conduct as described in this Complaint constitutes discrimination on the basis of sex in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and its implementing regulations.

92. At all relevant times, Defendant NOAA was an employer within the meaning of Title VII, 42 U.S.C. § 2000e, *et seq.*

93. At all relevant times, Plaintiff was an employee within the meaning of Title VII, 42 U.S.C. § 2000e, *et seq.*

94. At all relevant times, Plaintiff was qualified to perform the essential functions of her job.

95. Plaintiff is a member of a protected class (sex, including sexual orientation) as she is a gay woman.

96. Defendant was aware of Plaintiff's sex (including her sexual orientation).

97. Defendant's adverse treatment of Plaintiff was due to her sex.

98. Defendant's disparate treatment of Plaintiff was due to her sex.

99. Defendant's unlawful discrimination against Plaintiff via adverse actions including, but not limited to, its undue changes to her job duties, alterations to her work portfolio, constructive discharge, harassment, bullying, and isolation of Plaintiff was due to her sex.

100. Defendant constructively discharged Plaintiff due to her sex.

101. Plaintiff's sex was the cause of Defendant's adverse treatment of her, in violation of Title VII and its implementing regulations, as indicated by Defendant's different, preferential treatment of similarly situated employees of different sexes as described above.

102. Plaintiff's sex was at least a motivating factor in Defendant's adverse treatment of Plaintiff, but was also a but-for cause of Defendant's adverse treatment of Plaintiff. Defendant's actions therefore constitute unlawful sex discrimination in violation of Title VII.

103. Defendant's adverse treatment of Plaintiff gives rise to an inference of discrimination.

104. The acts committed by Defendant as alleged above willfully disregarded Plaintiff's rights.

105. As a direct and proximate result of these unlawful acts by Defendant, Plaintiff has suffered and continues to suffer economic and noneconomic damages including but not limited to economic losses, lost benefits and entitlements, damage to her career and reputation, damage to her health, pain, suffering, humiliation, and emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendant for economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, compensatory damages and damages for her mental anguish and humiliation and professional harm, and such other and further relief this Honorable Court determines just and equitable, including all available legal, statutory, and equitable relief.

**COUNT THREE**
**(Retaliation in Violation of Title VII)**

106. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

107. Defendant's conduct as described in this Complaint constitutes retaliation for protected EEO activity in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and its implementing regulations.

108. At all relevant times, Defendant NOAA was an employer within the meaning of Title VII, 42 U.S.C. § 2000e, *et seq.*

109. At all relevant times, Plaintiff was an employee within the meaning of Title VII, 42 U.S.C. § 2000e, *et seq.*

110. At all relevant times, Plaintiff was qualified to perform the essential functions of her job.

111. Plaintiff engaged in protected EEO activity, including, but not limited to, by repeatedly complaining of discrimination, harassment, and retaliation.

112. Defendant was aware of Plaintiff's protected activity.

113. Defendant's adverse treatment of Plaintiff was due to her protected activity.

114. Defendant's disparate treatment of Plaintiff was due to her protected activity.

115. Defendant's unlawful retaliation against Plaintiff via adverse actions including, but not limited to, its undue changes to her job duties, alterations to her work portfolio, constructive discharge, harassment, bullying, and isolation of Plaintiff was due to her protected activity.

116. Defendant constructively discharged Plaintiff in retaliation for her protected activity.

117. Plaintiff's protected activity was the cause of Defendant's adverse treatment of her, in violation of Title VII and its implementing regulations, as indicated by Defendant's different, preferential treatment of similarly situated employees with no history of protected activity as described above.

118. Plaintiff's protected activity was at least a motivating factor in Defendant's adverse treatment of Plaintiff, but was also a but-for cause of Defendant's adverse treatment of Plaintiff. Defendant's actions therefore constitute unlawful retaliation in violation of Title VII.

119. Defendant's adverse treatment of Plaintiff gives rise to an inference of retaliation.

120. The acts committed by Defendant as alleged above willfully disregarded Plaintiff's rights.

121. As a direct and proximate result of these unlawful acts by Defendant, Plaintiff has suffered and continues to suffer economic and noneconomic damages including but not limited to economic losses, lost benefits and entitlements, damage to her career and reputation, damage to her health, pain, suffering, humiliation, and emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendant for economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000), plus interest, fees, and costs, including

reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, compensatory damages and damages for her mental anguish and humiliation and professional harm, and such other and further relief this Honorable Court determines just and equitable, including all available legal, statutory, and equitable relief.

## **COUNT FOUR**
## **(Discrimination Based on Disability in Violation of the Rehabilitation Act)**

122. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

123. Defendant's conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of the Rehabilitation Act and its implementing regulations.

124. The Rehabilitation Act prohibits Defendant from discriminating against a qualified individual with a disability in the terms and conditions of federal employment, applying the standards of the Americans with Disabilities Act ("ADA").

125. At all relevant times, Defendant NOAA was an employer within the meaning of the Rehabilitation Act, 29 U.S.C. § 701, *et seq*.

126. At all relevant times, Plaintiff was an employee within the meaning of the Rehabilitation Act, 29 U.S.C. § 701, *et seq*.

127. At all relevant times, Plaintiff was qualified to perform the essential functions of her job.

128. At all relevant times, Plaintiff has been a qualified individual with a disability. Generalized Anxiety Disorder, which substantially limits major life activities including sleeping, concentrating, working, and managing stress. She could perform the essential functions of her position with the reasonable accommodation of full-time telework, as her strong performance demonstrated.

129. Defendant knew Plaintiff is an individual with a disability.

130. Defendant subjected Plaintiff to adverse treatment due to her disability, including resisting and restricting her telework accommodation, singling her out for a cubicle clean-out, denying her leave, and imposing in-person meeting mandates that were not imposed on employees without disability accommodations.

131. Defendant constructively discharged Plaintiff due to her disability.

132. Defendant treated Plaintiff disparately due to her disability. Defendant treated similarly situated employees without disabilities, or without Ms. McLenaghan's disability accommodation, more favorably.

133. Plaintiff's disability was the cause of Defendant's adverse treatment of her, in violation of the Rehabilitation Act and its implementing regulations, as indicated by Defendant's different, preferential treatment of similarly situated employees without disabilities, or without Ms. McLenaghan's disability accommodation, as described above.

134. Plaintiff's disability was at least a motivating factor in Defendant's adverse treatment of Plaintiff, but was also a but-for cause of Defendant's adverse treatment of Plaintiff. Defendant's actions therefore constitute unlawful disability discrimination in violation of the Rehabilitation Act.

135. Defendant's adverse treatment of Plaintiff gives rise to an inference of discrimination.

136. The acts committed by Defendant as alleged above willfully disregarded Plaintiff's rights.

137. As a direct and proximate result of these unlawful acts by Defendant, Plaintiff has suffered and continues to suffer economic and noneconomic damages including but not limited to

economic losses, lost benefits and entitlements, damage to her career and reputation, damage to her health, pain, suffering, humiliation, and emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendant for economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, compensatory damages and damages for her mental anguish and humiliation and professional harm, and such other and further relief this Honorable Court determines just and equitable, including all available legal, statutory, and equitable relief.

**COUNT FIVE**
**(Harassment and Hostile Work Environment Based on Disability in Violation of the Rehabilitation Act)**

138. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

139. Defendant's conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of the Rehabilitation Act and its implementing regulations.

140. At all relevant times, Defendant NOAA was an employer within the meaning of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*

141. At all relevant times, Plaintiff was an employee within the meaning of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*.

142. At all relevant times, Plaintiff was qualified to perform the essential functions of her job.

143. At all relevant times, Plaintiff has been a qualified individual with a disability. Generalized Anxiety Disorder, which substantially limits major life activities including sleeping,

concentrating, working, and managing stress. She could perform the essential functions of her position with the reasonable accommodation of full-time telework, as her strong performance demonstrated.

144. Defendant knew Plaintiff is an individual with a disability.

145. Defendant fostered and permitted harassment and a hostile work environment against Plaintiff, including, but not limited to: Defendant's resistance to and restriction of her accommodation, the cubicle clean-out directed at employees with telework accommodations, the repeated in-person meeting mandates, Ms. Edwards' statement that she was "sick of looking at squares on a screen," and the denial of leave, harassment, bullying, and isolation of Plaintiff, all of which targeted Ms. McLenaghan's disability and her need for a reasonable accommodation of telework.

146. Defendant constructively discharged Plaintiff due to her disability.

147. Plaintiff's disability was the cause of Defendant's adverse treatment of her, in violation of the Rehabilitation Act and its implementing regulations, as indicated by Defendant's different, preferential treatment of similarly situated employees without disabilities, or without Ms. McLenaghan's disability accommodation, as described above.

148. Plaintiff's disability was at least a motivating factor in Defendant's adverse treatment of Plaintiff, but was also a but-for cause of Defendant's adverse treatment of Plaintiff. Defendant's actions therefore constitute unlawful disability discrimination in violation of the Rehabilitation Act.

149. Defendant's adverse treatment of Plaintiff gives rise to an inference of discrimination.

150. The acts committed by Defendant as alleged above willfully disregarded Plaintiff's rights.

151. As a direct and proximate result of these unlawful acts by Defendant, Plaintiff has suffered and continues to suffer economic and noneconomic damages including but not limited to economic losses, lost benefits and entitlements, damage to her career and reputation, damage to her health, pain, suffering, humiliation, and emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendant for economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, compensatory damages and damages for her mental anguish and humiliation and professional harm, and such other and further relief this Honorable Court determines just and equitable, including all available legal, statutory, and equitable relief.

**COUNT SIX**
**(Retaliation in Violation of the Rehabilitation Act)**

152. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

153. Defendant's conduct as described in this Complaint constitutes retaliation for protected activity in violation of the Rehabilitation Act and its implementing regulations.

154. At all relevant times, Defendant NOAA was an employer within the meaning of Rehabilitation Act, 29 U.S.C. § 701, *et seq.*

155. At all relevant times, Plaintiff was an employee within the meaning of Rehabilitation Act, 29 U.S.C. § 701, *et seq.*

156. At all relevant times, Plaintiff was qualified to perform the essential functions of her job.

157. Plaintiff engaged in protected activity, including, but not limited to, by requesting reasonable accommodations for her disability and by complaining of discrimination on the basis of her disability.

158. Defendant was aware of Plaintiff's protected activity.

159. Defendant’s adverse treatment of Plaintiff was due to her protected activity.

160. Defendant’s disparate treatment of Plaintiff was due to her protected activity.

161. Defendant’s unlawful retaliation against Plaintiff via adverse actions including, but not limited to, its undue changes to her job duties, alterations to her work portfolio, constructive discharge, harassment, bullying, and isolation of Plaintiff was due to her protected activity.

162. Defendant constructively discharged Plaintiff in retaliation for her protected activity.

163. Plaintiff’s protected activity was the cause of Defendant’s adverse treatment of her, in violation of the Rehabilitation Act and its implementing regulations, as indicated by Defendant’s different, preferential treatment of similarly situated employees with no history of protected activity as described above.

164. Plaintiff’s protected activity was at least a motivating factor in Defendant’s adverse treatment of Plaintiff, but was also a but-for cause of Defendant’s adverse treatment of Plaintiff. Defendant’s actions therefore constitute unlawful retaliation in violation of the Rehabilitation Act.

165. Defendant’s adverse treatment of Plaintiff gives rise to an inference of retaliation.

166. The acts committed by Defendant as alleged above willfully disregarded Plaintiff’s rights.

167. As a direct and proximate result of these unlawful acts by Defendant, Plaintiff has suffered and continues to suffer economic and noneconomic damages including but not limited to economic losses, lost benefits and entitlements, damage to her career and reputation, damage to her health, pain, suffering, humiliation, and emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendant for economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, compensatory damages and damages for her mental anguish and humiliation and professional harm, and such other and further relief this Honorable Court determines just and equitable, including all available legal, statutory, and equitable relief.

## COUNT SEVEN
## (Failure to Provide a Reasonable Accommodation in Violation of the Rehabilitation Act)

168. Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

169. Defendant's conduct as described in this Complaint constitutes a failure to provide a reasonable accommodation in violation of the Rehabilitation Act and its implementing regulations.

170. Defendant was required to provide a reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability, absent undue hardship, applying the standards of the Americans with Disabilities Act ("ADA").

171. At all relevant times, Defendant NOAA was an employer within the meaning of the Rehabilitation Act.

172. At all relevant times, Plaintiff was an employee within the meaning of the Rehabilitation Act.

173. At all relevant times, Plaintiff has been a qualified individual with a disability. Plaintiff has Generalized Anxiety Disorder, which substantially limits major life activities including sleeping, concentrating, working, and managing stress.

174. At all relevant times, Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation, as her strong performance during the accommodation period demonstrated.

175. Defendant knew Plaintiff is an individual with a disability. Plaintiff disclosed her diagnosis to Ms. Edwards, applied for and was formally granted a reasonable accommodation of full-time telework, and submitted supporting medical documentation from her treating licensed clinical mental health counselor.

176. Plaintiff requested a reasonable accommodation. On May 24, 2022, Plaintiff submitted her first accommodation request. Ms. Edwards approved full-time telework effective June 13, 2022, and on September 7, 2022, approved a one-year renewal. Plaintiff thereafter requested renewal of her full-time telework accommodation on a long-term basis, supported by her treating provider's recommendation that full-time telework be granted on a permanent basis.

177. The accommodation Plaintiff requested was reasonable on its face. Defendant had already provided that same accommodation to Plaintiff for more than a year without incident, and Defendant provided permanent, unlimited full-time telework to at least one similarly situated comparator, demonstrating that it was not an undue hardship.

178. Defendant failed to provide Plaintiff the reasonable accommodation to which she was entitled. On August 25, 2023, the Agency's Reasonable Accommodation Coordinator informed Plaintiff that her managers were "resisting" granting long-term telework because they felt they had "accommodated [her] enough already." On September 1, 2023, Ms. Shostik extended Plaintiff's accommodation for only 60 days rather than the year Plaintiff's provider had recommended.. On October 19, 2023, after Plaintiff submitted supplemental medical documentation, Ms. Shostik approved full-time telework subject to a caveat conditioning it on Plaintiff reporting on-site when "the operational needs and work requirements of the organizational unit require [her] on-site presence" which materially changed the accommodation.

179. Defendant further failed to accommodate Plaintiff by using that caveat and related directives to override the accommodation, including by imposing in-person meeting requirements on Plaintiff that Defendant did not impose on employees without disability accommodations. On May 17, 2024, in Plaintiff's mid-year progress review, Ms. Edwards required additional in-person meetings whenever requested, language Ms. Edwards did not include in the reviews of her other direct reports. On July 11, 2024, Ms. Edwards told the team that she was scheduling in-person meetings because she was "sick of looking at squares on a screen," and Defendant applied that requirement to Plaintiff notwithstanding her accommodation.

180. On April 4, 2024, Defendant denied a further accommodation request concerning Plaintiff's speaking role at an upcoming grants panel that included Mr. Catena, the subject of Plaintiff's prior harassment complaint.

181. Defendant failed to engage in the interactive process in good faith. Defendant delayed and truncated Plaintiff's renewal requests, demanded repetitive medical documentation it did not require of comparators, imposed conditions that undermined the accommodation it purported to grant, and refused Plaintiff's related requests without meaningful consideration of alternatives.

182. Defendant cannot establish that providing Plaintiff full-time telework, or any effective alternative accommodation, would have imposed an undue hardship on the operation of its program, particularly where Defendant had already provided that accommodation to Plaintiff and provided it on a permanent basis to a comparator.

183. Defendant's failure to accommodate Plaintiff rendered her working conditions intolerable and constructively discharged her effective November 2, 2024.

184. The acts committed by Defendant as alleged above willfully disregarded Plaintiff’s rights.

185. As a direct and proximate result of these unlawful acts by Defendant, Plaintiff has suffered and continues to suffer economic and noneconomic damages including but not limited to economic losses, lost benefits and entitlements, damage to her career and reputation, damage to her health, pain, suffering, humiliation, and emotional distress.

WHEREFORE, Plaintiff demands judgment against Defendant for economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than one hundred thousand dollars ($100,000), plus interest, fees, and costs, including reasonable attorneys' fees and litigation costs, compensatory damages and damages for her mental anguish and humiliation and professional harm, and such other and further relief this Honorable Court determines just and equitable, including all available legal, statutory, and equitable relief.

## **DEMAND FOR JURY TRIAL**

Plaintiff, pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands a trial by jury on all issues.

Respectfully submitted,

SMITHEY LAW GROUP LLC

*/s/ Krista Johnson Smiley*

Lisa L. Walker (Bar No. 24248)
Krista Johnson Smiley, Esq. (Bar No. 32276)
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
T: (410) 919-2990
F: (410) 280-1602
Lisa.walker@smitheylaw.com
Krista.johnsonsmiley@smitheylaw.com
*Attorneys for Plaintiff*

Date: September 8, 2026